# STATE OF MICHIGAN

# COURT OF APPEALS

Allison Van,

       Plaintiff-Appellee,

v

Thomas Van III,

       Defendant-Appellant.

UNPUBLISHED
December 8, 2015

No. 323294
Menominee Circuit Court
LC No. 12-014142-DM

Before: SHAPIRO, P.J., and O'CONNELL and GLEICHER, JJ.

PER CURIAM.

The parties married in 2001 and during the marriage had three children. On August 23, 2012, plaintiff Allison Van filed a complaint for divorce. After determining that it had jurisdiction over the divorce, the trial court conducted a trial, and on January 17, 2014 the court entered the judgment of divorce which addressed, *inter alia*, the distribution of the marital property and defendant's child support arrearage. Defendant Thomas Van III appealed. We affirm the trial court's conclusion that it had jurisdiction over the parties' divorce. We also affirm the trial court's ruling that the postnuptial agreement signed by the parties is enforceable against defendant, and remand so that the court may review its findings made on the record at the relevant hearing and clarify the judgment regarding the sums to be paid by defendant to plaintiff under that agreement. We reverse the trial court's conclusion that it lacked the authority to retroactively modify child support and on remand direct the trial court to consider whether to retroactively modify child support to the date such modification was sought pursuant to MCL 522.603(2).

## I. RESIDENCY

Defendant first argues that the trial court clearly erred in finding that plaintiff met the 180-day state residency requirement of MCL 552.9(1). He asserts that, as a result, the trial court lacked subject-matter jurisdiction over the parties divorce.[1] We disagree.

---

[1] "A claim that the trial court lacked jurisdiction is a question of law that this Court reviews de novo." *Berger v Berger*, 277 Mich App 700, 702; 747 NW2d 336 (2008). However, "whether a party has satisfied the requirement of MCL 552.9(1)" is a question of fact that we review for

MCL 552.9(1) provides:

> (1) A judgment of divorce shall not be granted by a court in this state in an action for divorce unless the complainant or defendant has resided in this state for 180 days immediately preceding the filing of the complaint and, except as otherwise provided in subsection (2), the complainant or defendant has resided in the county in which the complaint is filed for 10 days immediately preceding the filing of the complaint.

"The statutory residency requirements are jurisdictional, and a divorce is void if it does not comply with the residency requirements." *Kar v Nanda*, 291 Mich App 284, 287; 805 NW2d 609 (2011). "Residence" is "a place of abode accompanied with the intention to remain." *Leader v Leader*, 73 Mich App 276, 280; 251 NW2d 288 (1977). Further, "the ordinary, common meaning of the term 'reside' does not require an intent to remain permanently or indefinitely," but it does require "an intent to remain." *Kar*, 291 Mich App at 288.

Plaintiff testified that she moved to Michigan in September of 2011 with the intent of "starting over" closer to her family after it became apparent to her that defendant did not intend to return to Michigan because he had found a girlfriend. As further support of her intent, she testified that although she did not bring all her personal belongings with her, they were packed in a storage unit in Arizona and were not left in the parties' Arizona home. The trial court credited this testimony and found that plaintiff had established residency in Michigan beginning in September of 2011, which was well over 180-days prior to when plaintiff filed her complaint for divorce.

However, in October of 2011 plaintiff and the children returned to the parties' Arizona home. The reason for this return was highly contested by the parties. Plaintiff testified that she went to Arizona because defendant would not leave the house she was supposed to be in with the children. She explained that he was pushing and hurting her and that she thought it would be safer, better, and less stressful to be away from him. Plaintiff testified that she intended to return to Michigan after the parties' third child was born. Defendant, however, testified that plaintiff went to Arizona because (1) she was pregnant with their third child, (2) the hospital in Arizona was better, (3) Arizona was where they came from, (4) Arizona was where plaintiff felt the most comfortable, and (5) plaintiff intended on residing in Arizona. He testified that plaintiff never told him she was coming back to Michigan after she had the baby. Instead, he testified she told him she was either staying in Arizona or going to Hawaii.

Plaintiff explained that defendant followed her to Arizona in April of 2012 and that, before the child was born, he hit her in the head and broke her eardrum. Thereafter, consistent with her stated intention, plaintiff returned to Michigan in either late June or early July of 2012 after the child was born. She testified that she packed "absolutely everything" she owned,

clear error. *Id*. "Questions of domicile and intent are also questions of fact." *Kar v Nanda*, 291 Mich App 284, 286; 805 NW2d 609 (2011). "A finding is clearly erroneous if, on all the evidence, the Court is left with the definite and firm conviction that a mistake has been made." *Berger*, 277 Mich App at 702.

including all of her children's and defendant's things, and returned to Michigan. She testified that they only left the furniture and the things that were too big and expensive to move across the country.[2]

Because plaintiff filed her complaint for divorce on August 23, 2012, she had to establish that either defendant or she had residency in Michigan starting on February 25, 2012. It is undisputed that, at the start of the 180-day period, plaintiff was physically located in Arizona, where she remained until late June/early July of 2012. Thus, for about four-months of the 180-day period, plaintiff was not physically located in Michigan. Defendant argues that this absence defeats her claim of state residency. Given the particular facts of this case and the trial court's credibility findings, we reject his argument.

MCL 552.9(1) does not require a party's "continuing physical presence" in the state or county for the entirety of the state- and county-residency periods. *Berger v Berger*, 277 Mich App 700, 703; 747 NW2d 336 (2008); *Leader*, 73 Mich App at 278, 283. In *Berger*, while addressing the 10-day county residency requirement of MCL 552.9, this Court held that a temporary absence from the county during the jurisdictional period would not defeat jurisdiction. See *Berger*, 277 Mich App at 703 ("Once plaintiff established and intended Jackson County as her residence on December 16, 2005, her temporary absence did not change it."). We explained that "determining residence or domicile requires a multi-factor analysis, but the preeminent factor is the person's intent." *Id*. at 704. Further, "an established domicile is not destroyed by a temporary absence if the person has no intention of changing his or her domicile." *Id*.

In *Leader*, the plaintiff and the defendant had lived in Michigan for a substantial period of time; however, around October 1, 1976, the plaintiff left Michigan and traveled to Kentucky with the defendant until about January 21, 1976. *Leader*, 73 Mich App at 278. The plaintiff testified that she traveled to Kentucky to attempt reconciliation with the defendant; however, she added that she had no intent of staying in Kentucky—or anywhere else with the defendant— unless the reconciliation was successful. *Id*. After it was apparent that the reconciliation would be unsuccessful, the plaintiff remained in Kentucky because she did not want to leave her children and because the defendant was threatening her. *Id*. The *Leader* Court concluded that, based on the plaintiff's intent, her residence remained in Michigan even though she was physically present in Kentucky for most of the jurisdictional period. *Id*. 278, 280.

This case is directly analogous to *Leader*. Like the plaintiff in *Leader*, plaintiff was absent from Michigan for about four months of the statutory period because of defendant's actions. However, her testimony clearly indicated that she intended to return to Michigan, that her absence was because she wanted to be away from defendant in order to assure her safety, and that she actually returned to Michigan in accordance with her stated intentions. The trial court found plaintiff's testimony credible, reasoning:

---

[2] Defendant also testified that only furniture was left in the Arizona house; however, he testified that the move was only supposed to be for a month so the children could visit their grandparents.

[Plaintiff] moved to Michigan in September of 2011. It was her intent to stay; and in my old-fashion way of thinking, and consistent with case law, is those are the two elements necessary. What is a person's intention and where are they living.

At the time this Complaint was filed on August 23rd, she was residing in the State of Michigan. Going back past the February 25th, 2012 180 days immediately prior to the filing, she had established her intent to reside in Michigan going back to September, 2011. That was interrupted due to actions of the Defendant which caused her to fear that she was being violently intruded upon so she moved back to Arizona but for all intents and purposes, she left that house in September with the intention of moving to Michigan. Apparently, the Defendant shared that intention at one time, maybe not consistently with the Plaintiff, but that—that's it. Done deal.

Defendant filed a motion for reconsideration and the trial court took additional testimony from the parties. Plaintiff testified that in February of 2012, she was physically present in Arizona, her children were going to school in Arizona, she had an Arizona's driver's license, she filed her taxes in Arizona, and she voted in a Republican primary in Arizona. Defendant argued that these facts negated her stated intent to return to Michigan. The trial court viewed resolution of the issue as a credibility determination and once again found plaintiff's testimony regarding her intent to reside in Michigan to be credible and that the testimony at the reconsideration hearing did not disprove that intent.

Based on our review of all the evidence at the jurisdictional hearing and the reconsideration hearing, and giving deference to the trial court's superior fact-finding ability, we are not left with a definite and firm conviction that the trial court mistakenly found plaintiff satisfied the 180-day state residence requirement of MCL 552.9(1). See *Berger*, 277 Mich App at 704.

## II. SETTLEMENT AGREEMENT

During the marriage, the parties formed two interconnected internet-based businesses, which was how they earned the vast majority of their income. Vamith Technologies, LLC was owned by plaintiff, defendant, and James Smith, a friend, with each party having a one-third share. Vanat Technologies, LLC was owned by plaintiff and defendant, with both parties having a 50% share.

On October 26, 2012, about one month after the divorce complaint was filed, plaintiff, defendant, and Smith executed an agreement. Under section 3 of the agreement, plaintiff was to receive 12 monthly payments as part of a "severance package" from Vanat. Under section 4 of the agreement, plaintiff was to receive 12 monthly payments as part of a buyout package regarding her ownership interest in Vamith. Under section 5 of the agreement, plaintiff was to receive 12 monthly payments in exchange for the sale of "Almost Gaming," a website, to an LLC operated by defendant. The agreement also contained a divorce clause that provided:

This agreement is in consideration of a pending divorce between [plaintiff] and [defendant]. This agreement is considered a voluntary separation of assets

and at no point and time during any divorce proceeding or after may any of these assets be made vulnerable to the decisions of any court or legal system. All agreements established within this document are final and excluded from any legal or divorce proceedings between these two parties.

Plaintiff testified that the purpose of the agreement was to "buy" her out of her interests in the businesses. She said that Smith came up with the valuation based on a forecasted income stream. Defendant also testified that the purpose of the agreement was to buy out plaintiff's share of Vamith so that the business could continue without her. He agreed that when the agreement was executed it was establishing the value of the business. He added that he did not want plaintiff to come back and demand half of the business on grounds that they had been married. Both parties testified that the agreement was written by defendant and was edited by plaintiff and Smith. Defendant testified that when he signed the agreement, he believed that it was a fair and equitable resolution of Vamith with plaintiff.

Plaintiff, defendant, and Smith all signed and notarized the agreement, and they initialed each page. Plaintiff received the first payment under section 3, the first payment under section 4, and the first 10 payments under section 5. However, after the child support order was entered, defendant drafted a document indicating plaintiff had breached the contract, so the business had decided to suspend payment under sections 3 and 4 of the agreement. After payments stopped, plaintiff filed a motion to enforce the agreement. She argued that the agreement was a postnuptial settlement agreement. Defendant argued that it was a business contract that was unenforceable in the divorce proceedings because Smith, a third party, was a party to the contract. The trial court denied plaintiff's motion but preserved it for resolution in the final divorce hearing.

At the final divorce hearing, the trial court concluded that the agreement was a marital settlement agreement. The court ruled that the parties' share of the businesses was marital property.[3] The court then stated that it was going to order that defendant pay plaintiff his share of the monies listed in sections 3, 4, and 5 of the agreement. However, the actual judgment of divorce does not reflect any limitation on the amounts to be paid; instead, it sets forth the amounts listed in the agreement at full value.

Defendant raises three arguments as to why the agreement should not be enforced. First, he asserts that it is an antenuptial or prenuptial agreement that should be voided because the facts and circumstances have so substantially changed since it was executed that its enforcement

---

[3] "In general, assets a spouse earns during the marriage are properly considered part of the marital estate, and thus subject to equitable division." *Reed v Reed*, 265 Mich App 131, 152; 693 NW2d 825 (2005). In contrast, a spouse's separate property consists of property earned or obtained before a marriage. *Reeves v Reeves*, 226 Mich App 490, 493, 496; 575 NW2d 1 (1997). Here, the businesses covered by the agreement were formed during the marriage and were how the parties earned the vast majority of their income. Thus, the trial court properly classified the businesses as marital assets.

would be unfair and unreasonable. See *Reed v Reed*, 265 Mich App 131, 142-143; 693 NW2d 825 (2005) (listing the circumstances when an antenuptial or prenuptial agreement may be voided). However, the agreement in this case is a postnuptial agreement, not an antenuptial or prenuptial agreement, because it was entered into *after* plaintiff filed her complaint for divorce. Accordingly, defendant is not entitled to relief under this theory.

Defendant next argues that the portion of the agreement where the parties agreed not to use the forecasted income as part of a divorce proceeding was unenforceable and that, as a result, the entire agreement should be voided. Defendant's argument is far from clear and he provides no authority in support of his position. "It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position." *Mitcham v Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959). Accordingly, we decline to address this theory further.[4]

Moreover, parties may reach settlements as to the distribution of marital assets. *Vittiglio v Vittiglio*, 297 Mich App 391, 399-400, 405; 824 NW2d 591 (enforcing a settlement agreement that divided marital assets). "[C]ourts must uphold divorce property settlements reached through negotiation and agreement of the parties." *Quade v Quade*, 238 Mich App 222, 226; 604 NW2d 778 (1999). Parties may also agree on the value of marital assets. See *Kaftan v Kaftan*, 300 Mich App 661, 662-663, 667-668; 834 NW2d 657 (2013) (upholding a property settlement where the parties agreed that one party would make a series of payments even though there was no official valuation of the assets involved). A postnuptial agreement is valid "if it is fair, equitable, and supported by sufficient legal consideration." *Rockwell v Estate of Rockwell*, 24 Mich App 593, 596; 180 NW2d 498 (1970).

In *Lentz v Lentz*, 271 Mich App 465, 477-478; 721 NW2d 861 (2006), this Court expressly held that postnuptial agreements entered into after the parties have separated or filed for divorce are *not* voided by public policy. Instead, "[p]ublic policy favors upholding a property agreement negotiated by the parties when divorce or separate maintenance is clearly imminent." *Id*. The agreement in this case was executed after plaintiff filed for divorce. The parties both had a part in drafting it. The agreement was signed and notarized by both parties, and they initialed every page. "Absent fraud, coercion, or duress, the adults in the marriage have the right and the freedom to decide what is a fair and appropriate division of the marital assets, and our courts should not rewrite such agreements." *Id*. at 472. Here, there are no allegations of fraud, coercion, or duress. Accordingly, the agreement was clearly not void as against public policy and was, in fact, permissible.

Finally, defendant argues that the agreement should not have been addressed in the divorce proceedings because it was a business contract that bound a third party by its terms. In

---

[4] Defendant suggests that resolution of the issue would surely require "a thorough analysis of contract and business law;" however, he does not provide any further statements explaining why the position taken by the trial court was incorrect, nor does he provide a thorough analysis of business law.

support, defendant directs this Court to *Shouneyia v Shouneyia*, 291 Mich App 318, 323; 807 NW2d 48 (2011), where we held that a court may not render an adjudication that affects the rights of an entity that is not a party to the action. However, in this case, the trial court did not purport to adjudicate the rights of the third party corporations. Rather, it ordered defendant to pay what would have been his share of the amounts that the parties determined were fair values for plaintiff's contributions to the shared businesses. A court sitting in equity has broad discretion to award property to arrive at a fair and equitable property settlement. *Boonstra v Boonstra*, 209 Mich App 558, 563; 531 NW2d 777 (1995). Rather than viewing the documents as a contract between the business and plaintiff, it viewed it as a settlement agreement between defendant and plaintiff. Its ruling specifically exempted the third party business from having to pay any amount. The trial court did not err by adjudicating the rights of a third party. However, it did err to the extent that the judgment of divorce did not reflect its oral opinion on this issue. On remand, we order the trial court to reconcile the judgment of divorce with its oral opinion.

### III. MODIFICATION OF CHILD SUPPORT

Finally, defendant argues that the trial court erred when it refused to consider retroactive modification of his child support obligations. We agree.

As a general rule, a court may not retroactively modify an accumulated child support arrearage. *Adams v Linderman*, 244 Mich App 178, 185-186; 624 NW2d 776 (2000). In fact, this has been described as "the rule against retroactive child support orders," and it not only precludes retroactive reductions in child support, but also retroactive increases. *Harvey v Harvey*, 237 Mich App 432, 437-439; 603 NW2d 302 (1999). However, MCL 552.603(2) provides:

> (2) Except as otherwise provided in this section, a support order that is part of a judgment or is an order in a domestic relations matter is a judgment on and after the date the support amount is due as prescribed in section 5c, with the full force, effect, and attributes of a judgment of this state, and is not, on and after the date it is due, subject to retroactive modification. No additional action is necessary to reduce support to a final judgment. *Retroactive modification of a support payment due under a support order is permissible with respect to a period during which there is pending a petition for modification, but only from the date that notice of the petition was given to the payer or recipient of support.* [emphasis added.]

Thus, based on the statutory language, the trial court may exercise its discretion to retroactively modify child support payments from the date that notice of a pending petition for modification is given to the payer or the recipient of support.

Here, defendant filed a motion to modify the child support order on May 17, 2013, and he filed a proof of service on the same date that established plaintiff had been provided notice of the pending motion. Thus, the trial court had authority to retroactively modify defendant's child support obligations starting on May 17, 2013. See MCL 552.603(1). However, the trial court erroneously believed that it was wholly unable to retroactively modify child support obligations. Given that the statute clearly permits modification under these circumstances, the court's ruling was an abuse of discretion based on an erroneous view of the law.

-7-

We remand to the trial court for further consideration of this issue. On remand, the court may, in its discretion, retroactively modify defendant's child support obligations. See MCL 552.603(2) ("Retroactive modification . . . is permissible" under certain circumstances); see also *Cipriano v Cipriano*, 289 Mich App 361, 374; 808 NW2d 230 (2010) (holding that "[t]he retroactivity of a modification is a matter within the court's discretion; however, the modification may not take effect before the time the petition to modify was filed").

## IV. CONCLUSION

We affirm the trial court's determination that plaintiff satisfied the 180-day state residency requirement of MCL 552.9(1). We also affirm the trial court's decision to enforce the postnuptial property settlement agreement between the parties, and remand so that the court may modify the judgment so as to be consistent with the court's oral findings regarding the amounts due between the divorcing parties under that agreement. We also remand to the trial court to determine whether to retroactively modify defendant's child support obligations from May 17, 2013 until the order modifying child support was entered. We do not retain jurisdiction.

/s/ Douglas B. Shapiro
/s/ Peter D. O'Connell
/s/ Elizabeth L. Gleicher